**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GILBERTO VARGAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-06068 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gilberto Vargas, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), injured his knee playing basketball at Menard Correctional Center ("Menard") in 2013. He sought treatment at IDOC facilities for years, finally obtaining an MRI that diagnosed him with a torn anterior cruciate ligament ("ACL") and meniscus in 2018. In 2019, he successfully underwent surgery. Based on the delay in his treatment, Vargas has sued Wexford Health Sources, Inc. ("Wexford") and three Wexford employees, Dr. Rozel Elazegui, Dr. Christian Okezie, and Dr. Marlene Henze (collectively, "Wexford Defendants"), as well as two IDOC officials, Walter Nicholson and Sherwin Miles (together, "IDOC Defendants"). Vargas claims Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Vargas, Wexford Defendants, and IDOC Defendants now all seek summary judgment in their respective favors. For the reasons stated below, Vargas's motion (Dkt. No. 75) is denied, IDOC Defendants' motion (Dkt. No. 83) is denied, and Wexford Defendants' motion (Dkt. No. 86) is granted as to Dr. Elazegui and Wexford but denied as to Dr. Okezie and Dr. Henze.

## BACKGROUND

The following facts are drawn from the parties' submissions pursuant to Local Rule 56.1.[1]

### I.     Medical Care

In 2013, Vargas injured his knee while playing basketball at Menard. (IDOC Resp. to Pl.'s SF ("IRPSF") ¶ 17, Dkt. No. 111; Wexford Resp. to Pl.'s SF ("WRPSF") ¶ 17, Dkt. No. 109.) At the time of his injury, the attending nurse indicated that Vargas should be referred to a doctor because his knee was swollen, his left leg had limited range of motion, he had a limp, and he could not put all his weight on his left leg. (IRPSF ¶ 22; WRPSF ¶ 22.) The doctor Vargas saw ordered an x-ray that Vargas contends showed no fractures; Defendants, however, claim that the cited medical records do not rule out fractures. (IRPSF ¶ 23; WRPSF ¶ 23.) Despite the x-ray results, Vargas continued to experience pain; indeed, a June 2014 nurse's note indicates that Vargas was still in "a lot of pain" three months after his injury. (WRPSF ¶ 24.)

In August 2017, Vargas was transferred from Menard to Stateville Correctional Center ("Stateville"). (Pl.'s Resp. to Wexford SF ("PRWSF") ¶ 14, Dkt. No. 106.) A few months after his transfer, on January 17, 2018, he injured his knee getting down from a top bunk. (Pl.'s Resp. to IDOC SF ("PRISF") ¶ 11, Dkt. No. 104.) Vargas and IDOC Defendants dispute whether the

---

[1] Defendants contend that Vargas's Rule 56.1 submissions are improper because they include unsupported factual assertions and, when responding to Defendants' statements of facts, add extraneous assertions. But Vargas's filings do not impede the Court's ability to assess the record. So, to the extent Defendants request that the Court formally strike Vargas's submissions, their request is denied. *See Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt. v. Vill. of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012) ("[M]otions to strike are disfavored in summary judgment proceedings unless they expedite the Court's work."); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[A] district court has broad discretion to require strict compliance with Local Rule 56.1."). "[C]onsistent with its obligations under the federal and local rules, the Court will rely only on material statements of fact which are both admissible and supported by the record." *Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt.*, 879 F. Supp. 2d at 960. Vargas's counsel is cautioned to adhere to the Local Rules in the future.

January 2018 injury was a new one or an aggravation of Vargas's 2013 injury. (*Id.* ¶ 11). Twelve days later, on his way back to his cell from the meeting with Dr. Elazegui described below, Vargas fell while climbing stairs on his crutches, but it is disputed whether his fall had anything to do with the instability of his knee. (PRWSF ¶ 15; WRPSF ¶ 43.)

On January 29, 2018, Vargas saw Dr. Elazegui, a physician who served as Stateville's Medical Director from February 2018 to August 2018. (PRWSF ¶¶ 4, 14.) The January 29 meeting was the first time Dr. Elazegui saw Vargas.[2] (PRWSF ¶ 14.) At that meeting, Dr. Elazegui referred Vargas for an MRI,[3] a request he presented for collegial review on February 6, 2018. (PRWSF ¶ 14.) Collegial review is a system used when a physician at Stateville wants to refer a patient to a specialist outside Stateville. (*Id.* ¶ 18.) The collegial review process requires the physician seeking outside treatment to confer with another physician, known as the utility management physician, who is an experienced doctor charged with ascertaining whether the request for outside referral is appropriate. (*Id.*)

Following collegial review, according to Wexford Defendants, Vargas was approved for an MRI on February 22, 2018. (*Id.* ¶ 19.) Vargas, in turn, claims that the document on which Wexford Defendants rely indicates that no MRI was approved until July 18, 2018. (*Id.*) But while the document does appear to have "7/18/18" written in the approval section, elsewhere it states that the MRI was conducted on July 17, 2018—one day before it was purportedly

---

[2] Vargas disputes that this was the first time he saw Dr. Elazegui. As support, he cites his own deposition testimony, in which he states only that he saw Dr. Elazegui a number of times (not that he had seen Dr. Elazegui before January 29). (PRWSF ¶ 14.) Moreover, Wexford Defendants cite Vargas's deposition testimony, which contains the following exchange: "Q. Now that you've seen that January 17 note you agree that the first time you saw Dr. Elazegui was on January 29, 2018, correct? A. Yes, ma'am." (Wexford SF, Ex. A ("Vargas Dep.") at 92:3–6, Dkt. No. 88-1.)

[3] An MRI, or magnetic resonance imaging, is a diagnostic test that uses a magnetic field and radio waves to create detailed images of organs and tissues in the body. *See, e.g.*, https://www.mayoclinic.org/tests-procedures/mri/about/pac-20384768 (last visited March 25, 2024).

approved. (Wexford SF, Ex. F ("Vargas Med. Rec.") at 20, Dkt. No. 124.) And in Vargas's

deposition, he recalled Dr. Elazegui telling him that his MRI had been approved in March 2018.

(Wexford SF, Ex. A ("Vargas Dep.") at 83:15–22, Dkt. No. 88-1.) Either way, Vargas ultimately

underwent an MRI at the University of Illinois-Chicago ("UIC") on July 17, 2018. (PRWSF

¶ 24.) The MRI indicated, among other things, that Vargas's ACL was "discontinuous" and

"appear[ed] ruptured" and that "[t]he posterior horn of the medial meniscus demonstrate[d]

fraying with a tear." (WRPSF ¶ 48; Pl.'s SF, Ex. 10 ("MRI Notes") at 1, Dkt. No. 77-10.)

     Vargas had seen Dr. Okezie on June 20, 2018, shortly before his MRI. Wexford

Defendants claim that this was their first meeting, but Vargas testified that it was only "possibly"

their first meeting. (PRWSF ¶ 23; Vargas Dep. at 92:23–93:1.) Dr. Okezie's note for the

appointment mentions that Vargas had been approved for an MRI by that date. (Vargas Med.

Rec. at 12.) He prescribed Vargas Tramadol and gave him a shower permit, allowing him to

shower more frequently than other prisoners in the general population. (PRWSF ¶ 23.) Dr.

Okezie subsequently saw Vargas after his MRI on August 3, 2018; at that time, he planned to

refer Vargas to UIC's orthopedic clinic for an evaluation and to continue his Tramadol

prescription. (*Id.* ¶ 25.) The extent to which Dr. Okezie followed through on this plan is unclear.

     Vargas saw Dr. Henze on December 20, 2018. (*Id.* ¶ 27.) Wexford Defendants state that

it was the first meeting between the two; Vargas disputes this point and claims that he saw her at

least thirty times. (*Id.*) Whether or not it was their first meeting, the parties agree that on

December 20, 2018, Dr. Henze renewed Vargas's Tramadol prescription, prescribed him

Robaxin, ordered x-rays, and referred him for an orthopedic evaluation, which was approved six

days later. (*Id.*) She met with Vargas again in May 2019, shortly following his evaluation at UIC.

(PRWSF ¶ 28.) Dr. Henze referred Vargas for physical therapy pursuant to the UIC orthopedist's

recommendation, receiving approval for his follow up appointment at UIC on May 28, 2019. (*Id.* ¶¶ 28–29.) However, Vargas was placed in segregation in June 2019 for eight months, which prevented him from attending physical therapy. As a result, Dr. Henze ordered that he be provided with instructions for doing physical therapy independently, renewed his Tramadol and Robaxin prescriptions, and ordered him Motrin. (*Id.* ¶¶ 30–31.)

On August 16, 2019, Vargas saw Dr. Ankur Behl, a specialist in orthopedic surgery, for the first time. (*Id.* ¶¶ 9, 32.) Dr. Behl ordered a second MRI and instructed Vargas to follow up once the MRI had occurred, which was September 9, 2019. (*Id.* ¶¶ 32–33.) The MRI revealed a bucket handle medial meniscus tear, a condition that can either occur at the same time as an ACL tear or occur over time. (*Id.* ¶ 35.) It also indicated a "[c]hronic complete tear" of the ACL. (Vargas Med. Rec. at 26.) Wexford Defendants claim that it is impossible for Dr. Behl to know when Vargas tore his ACL and meniscus; that said, Dr. Behl testified that the injuries were consistent with Vargas's theory that he had first injured his leg in 2013. (PRWSF ¶¶ 37, 39.) After consulting with Dr. Behl on the pros and cons of undergoing surgery, Vargas opted to pursue surgery. (*Id.* ¶ 44.) Four weeks later, on October 11, 2019, Dr. Behl performed the surgery. (*Id.* ¶¶ 44–45.)

## II.     Grievances and the IDOC Defendants

Between his transfer to Stateville and his surgery, Vargas filed a number of grievances about his knee pain. At Stateville, grievances are the formal mechanism by which inmates may raise concerns about medical care. (IRPSF ¶ 54.) Before filing a formal grievance, a person in custody generally must attempt to resolve issues through their counselor. (PRISF ¶ 27.) If that is not successful, the inmate may file a written grievance with either their counselor or the grievance officer within sixty days of the incident giving rise to the grievance. (*Id.*) A grievance must contain as much information as possible—a description of the event, names of people

involved, the location, and so on. (*Id.* ¶ 32.) The grievance officer investigates as appropriate, at times conducting interviews or obtaining documents, and then provides the warden with the results of their investigation. (*Id.* ¶ 28.) The warden makes a decision, which is submitted to the inmate. (*Id.*) That decision may be appealed to the Administrative Review Board ("ARB"), which reviews the grievance and report to provide a recommendation to the Director of IDOC. (*Id.* ¶ 29.) The decision by the Director of IDOC marks the end of the grievance process. (*Id.*)

IDOC Defendants note two exceptions to the standard grievance process. First, there is a separate process for emergency grievances, which are reviewed to determine whether they entail a "substantial risk of imminent personal injury, sexual abuse, or other serious or irreparable harm to self." (*Id.* ¶ 30.) Second, 20 ILAC § 504.870 explicitly allows certain issues to be addressed directly to the ARB without a requirement of exhausting the grievance process: involuntary administration of psychotropic medication, protective custody decisions, disciplinary proceedings made at a different facility than where the person is currently incarcerated, and other issues involving a facility at which the person is not currently incarcerated, except for personal property issues. (*Id.* ¶ 31.)

The parties do not dispute the existence of Vargas's grievances here, though they do disagree over the grievances' procedural compliance. In particular, before filing the instant lawsuit *pro se* on September 5, 2018, Vargas submitted grievances related to his knee injury on the following dates: January 26, 2018, January 31, 2018, February 26, 2018 (two grievances), May 28, 2018, July 25, 2018, and July 27, 2018; beyond those, Vargas continued filing grievances after he had brought the suit. (*See generally* PRISF, Exs., Dkt. Nos. 104-1–104-20.) For present purposes, the Court focuses on the former set of grievances.

6

With respect to Vargas's January 26, 2018, and January 31, 2018, grievances, IDOC Defendants state there is no evidence that the ARB ever received—or even saw—them. (PRISF ¶ 34.) Vargas, though, contends that the ARB must have seen them because in August 2018, he contacted the ARB to complain about a lack of resolution, after which the ARB told Vargas the grievance was not "logged" as having been returned to him "at first level" and directed him to contact his correctional counselor to resolve the issue. (*Id.*; *see also* PRISF, Ex. 11 ("ARB Correspondence"), Dkt. No. 104-11.)[4] The two grievances were eventually deemed moot in January 2019, one year after their filing, on the grounds that Vargas had since received medical treatment. (PRISF, Ex. 12, Dkt. No. 104-12.)

As for the two February 26, 2018, grievances, IDOC Defendants state that they are deficient because they do not contain a counselor's response, which is the first step of a standard grievance. (PRISF ¶¶ 27, 33.) Vargas responds that they were emergency grievances for which he could bypass the counselor. (*Id.* ¶ 33.) Regardless, the grievances were denied as non-emergencies. (PRISF, Ex. 7, Dkt. No. 104-7.) When Vargas appealed, the ARB indicated that it needed additional information, citing missing copies of his original grievance and the corresponding response. (PRISF, Ex. 8, Dkt. No. 104-8.)

Likewise, IDOC Defendants state that the ARB did not see either the July 25, 2018, grievance or the July 27, 2018, grievance. (PRISF ¶ 35.) As before, both grievances were filed as emergency grievances, both were rejected as emergencies, and both were subsequently directly appealed rather than resubmitted as standard grievances. (*Id.*)

---

[4] Vargas's correspondence describes a grievance dated January 26, 2018, and a grievance dated February 14, 2018 (instead of January 31, 2018). (ARB Correspondence at 3.) But the grievance number for the latter grievance corresponds to the grievance number on the January 31, 2018, grievance. (ARB Correspondence at 3 (listing "Grievance # 2152"); PRISF, Ex. 10 at 2 (same), Dkt. No. 104-10.)

Indeed, IDOC Defendants contend that only one of Vargas's pre-lawsuit grievances was fully resolved: the May 28, 2018, grievance. (PRISF ¶ 38.) This grievance was filed as a standard grievance, addressed by the grievance officer in August 2018 (although Vargas contends that it was only addressed in part), and unsuccessfully appealed to the ARB, which denied Vargas's appeal on October 9, 2018. (*Id.*) This date is roughly one month after Vargas filed the lawsuit on September 5, 2018.

Finally, Vargas claims that either Miles or Nicholson reviewed many of his grievances, including some of the grievances discussed above. Miles was the Acting Warden at Stateville from January 1, 2019, to July 31, 2019 (IRPSF ¶ 8), and Nicholson was the Warden at Stateville from February 1, 2018, to December 31, 2018 (*id.* ¶ 10). IDOC Defendants agree that their names appear on the signature lines for some grievances; however, they contend they did not review the grievances personally, instead claiming that the grievances were adjudicated by a designee. (*Id.* ¶¶ 56, 58–59.) In addition, Vargas states that he discussed his injury with Nicholson, who told Vargas that he would "stay on top of it." (*Id.* ¶ 60.) Nicholson denies this interaction, stating that he does not recall Vargas or having a conversation with him. (Pl.'s Resp. to IDOC Statement of Additional Facts ¶ 9, Dkt. No. 114.) Either way, Vargas testified that neither Miles nor Nicholson contacted him about his medical ailments. (IRPSF ¶ 62.)

### III. Procedural History

Vargas filed the operative complaint with the assistance of recruited counsel. The SAC asserts six counts—one against each Defendant. Each count arises under 42 U.S.C. § 1983 and alleges deliberate indifference to Vargas's serious medical condition in violation of his rights under the Eighth Amendment, as applied to the states through the Fourteenth Amendment. After the parties conducted discovery, Vargas filed a motion for partial summary judgment on the issue of liability, seeking a trial on damages if the motion is resolved in his favor. (Dkt. No. 75.)

For their part, IDOC Defendants moved for summary judgment on the claims against Miles and Nicholson (Dkt. No. 83), and Wexford Defendants filed a motion for summary judgment on the four counts against them (Dkt. No. 86.)

## DISCUSSION

When considering a summary judgment motion, the Court must determine if a genuine issue of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). The Court's function is to "determine whether there is a genuine issue for trial," not to make determinations of truth or weigh evidence. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018). Courts must avoid "the siren song that tempts [them] into making factual determinations at the summary judgment stage." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021).

The party moving for summary judgment bears the burden of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Once a properly supported motion for summary judgment is made, the opposing party must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). In deciding whether there is a genuine issue, the Court must "construe all facts and reasonable inferences" in the light most favorable to the nonmovant. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017). And when addressing cross-motions for summary judgment, the Court must consider the motions "one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party." *Black Earth Meat Mkt., LLC v. Village of Black Earth*, 834 F.3d

841, 847 (7th Cir. 2016). The Court's assessment of each legal issue in this dispute accounts for the burden-flipping analysis that governs cross-motions.

### I.     Exhaustion

At the outset, IDOC Defendants raise the threshold issue of exhaustion. The Prison Litigation Reform Act made exhausting available administrative remedies a mandatory prerequisite to prisoner lawsuits. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); 42 U.S.C. § 1997e(a). The Seventh Circuit "take[s] a strict compliance approach to exhaustion." *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) (internal quotation marks omitted). In short, "a 'sue first, exhaust later' approach is not acceptable." *Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020). Because it is an affirmative defense, the defendants carry the burden of proving that the plaintiff failed to exhaust. *Ramirez v. Young*, 906 F.3d 530, 533 (7th Cir. 2018).

As mentioned above, Vargas filed this suit *pro se* on September 5, 2018. IDOC Defendants correctly point out that the date the lawsuit was filed is the key date for exhaustion purposes—not, as Vargas suggests, the date on which he filed his operative, amended complaint. *Chambers*, 956 F.3d at 984. It follows that any grievance submitted after September 5, 2018, was not timely exhausted. Additionally, that Vargas eventually received his requested surgery after filing suit does not nullify the pre-suit exhaustion requirement. *Id*.

Accordingly, the only grievances that Vargas theoretically could have exhausted before he brought this lawsuit are the two January 2018 grievances, the two February 2018 grievances, the May 2018 grievance, and the two July 2018 grievances. The May 2018 grievance can be disposed of quickly; although the parties agree that Vargas eventually exhausted this grievance, he only did so after he had filed this lawsuit—thereby rending it untimely. *Id.* The Court addresses the remaining grievances in more detail below.

Beginning with the February and July grievances, Vargas argues that he satisfied the exhaustion requirement because, after he filed the grievances on an emergency basis, he directly appealed their denial to the ARB. But a direct appeal to the ARB does not exhaust a grievance filed on an emergency basis and later rejected as a non-emergency. Rather, in that scenario, Illinois law requires the inmate "to resubmit his grievances under the normal procedure and complete the full three-stage process in order fully to exhaust available remedies." *Williams v. Wexford health Sources, Inc.*, 957 F.3d 828, 832 (7th Cir. 2020) (citing 20 ILAC § 504.840). Vargas did not follow this procedure here, so those grievances were not exhausted.

In contrast, the Court finds that Vargas did exhaust the two January 2018 standard grievances due to the unreasonable amount of time it took prison officials to respond. A plaintiff "must exhaust only those administrative remedies that are available to him." *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002). Relevant here, an unreasonable delay in responding to a properly filed grievance constitutes a scenario in which administrative remedies are unavailable for exhaustion purposes. *E.g.*, *Massey v. Hardy*, No. 1:21-CV-00560, 2023 WL 2814768, at *4 (N.D. Ill. Apr. 6, 2023). This rule prevents prison officials from "exploit[ing] the exhaustion requirement through indefinite delay in responding to grievances." *Lewis*, 300 F.3d at 833 (internal quotation marks omitted). As part of their burden to establish a failure to exhaust, "the defendants must show beyond dispute that remedies were available." *Ramirez*, 906 F.3d at 534.

Here, by the time Vargas filed suit, roughly seven months had passed since he filed his grievances—"a more than reasonable time for jail officials to respond." *Smith v. Boyle*, No. 02 C 2788, 2003 WL 174189, at *3 (N.D. Ill. Jan. 27, 2003). Indeed, seven months is considerably longer than the two-month goal set out via statute. *See* 20 ILAC § 504.830(e) ("The Grievance

Officer shall consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer within two months after receipt of the written grievance, when reasonably feasible under the circumstances."). This two-month mark "is not an absolute deadline," but "a response to a grievance should fall within the ballpark." *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *2-3 (N.D. Ill. July 2, 2001). What is more, Vargas attempted to prompt administrative resolution of his grievances when he reached out to the ARB before filing suit. Clearly, he did not initiate litigation in an effort to deprive Stateville of its chance to resolve his complaints through the grievance process. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("[O]nce a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement.").[5]

IDOC Defendants suggest that Vargas's grievances were complicated and required a lengthy amount of time to resolve. This is belied by the record evidence. The first investigatory documents are from May 2017—about three-and-a-half months after the filing of the grievances—and they are extremely cursory responses sent by the "Medical Staff" to the "Grievance Counselor." (IDOC SF, Ex. 6, at 17–18, Dkt. No. 84-6.)  With no elaboration, the responses claim that Vargas was "receiving all medications and treatments as ordered" and "deny allegation[s] of staff misconduct." (*Id.*) In fact, there are handwritten notes on these forms questioning the lack of detail. (*Id.*) But based on the emails sent in December 2018, another

---

[5] An inmate's lack of diligence can cut against his argument that administrative remedies are unavailable. *Reid v. Balota*, 962 F.3d 325, 330 (7th Cir. 2020). But IDOC Defendants do not point to any such evidence in this case. Their argument that Vargas should have exhausted his administrative remedies by timely appealing the January 2019 resolution to the ARB overlooks that the key date for exhaustion is the date of filing. *Chambers*, 956 F.3d at 984. IDOC Defendants cannot retroactively kick Vargas out of court by responding to his grievances only after he filed his lawsuit and after a reasonable amount of time had long since passed. *See Lewis*, 300 F.3d at 833 (expressing the concern that the exhaustion requirement might be "exploit[ed]").

seven months passed before anyone followed up to request additional explanation. (*Id.* at 15–16.) And by that point, Vargas had already filed suit after affording officials ample time to respond. In short, the record evidence indicates that the investigation into Vargas's grievances did not, in reality, require an inordinate length of time to complete. *Cf. Ford v. Johnson*, 362 F.3d 395, 400 (7th Cir. 2004) ("Some appeals are simple and will be wrapped up within two months; others are more complex. This was one of the more complex ones, which is why the Administrative Review Board wanted to take Ford's live testimony.").

IDOC Defendants' motion for summary judgment on exhaustion grounds is therefore denied. Vargas exhausted his two January 2018 grievances because the unreasonable delay by prison officials rendered administrative remedies unavailable.

## II. Eighth Amendment

The Court turns now to the merits of Vargas's Eighth Amendment claims. "The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (internal quotation marks omitted). Below, the Court addresses whether the record would support a finding that each Defendant—the individual Wexford Defendants, Wexford itself, and IDOC Defendants—is liable for such a claim.

### A. Individual Wexford Defendants

"To determine if the Eighth Amendment has been violated in the prison medical context," courts must "perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016), *as amended* (Aug. 25, 2016). The analysis must be individualized; indeed, § 1983 does not impose liability "for a violation of an inmate's constitutional rights" unless the inmate

13

"show[s] that the defendant was ***personally responsible*** for that violation." *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (emphasis added); *see also Pacelli v. deVito*, 972 F.2d 871, 878 (7th Cir. 1992) ("Section 1983 does not create collective or vicarious responsibility."). "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Rasho*, 856 F.3d at 478 (internal quotation marks omitted).

Here, the objectivity prong is not at issue because there is no doubt that a torn ACL qualifies as a serious medical condition. *E.g.*, *LaBoy v. Ghosh*, No. 11 C 3950, 2013 WL 182815, at *4 (N.D. Ill. Jan. 17, 2013).[6] The dispute instead lies with the subjective component of the test, deliberate indifference. To show deliberate indifference, "a plaintiff must establish that [the] official knows of and disregards an excessive risk to inmate health or safety or that the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotation marks omitted). "[P]urposeful conduct" is not required, but conversely, mere negligence is not enough. *Id.* Courts must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

Vargas raises three arguments in support of his claim that the individual Wexford Defendants acted with deliberate indifference: they failed to treat his pain adequately, they delayed treatment, and they persisted in an ineffective course of treatment. Essentially, these theories all come down to the notion that, although the individual Wexford Defendants did

---

[6] Defendants do not contest that Vargas's condition was sufficiently serious to support an Eighth Amendment claim for purposes of these motions.

undoubtedly provide Vargas some treatment, their treatment was constitutionally inadequate. In such a context, "evaluating the subjective state-of-mind element can be difficult." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Malpractice on its own does not equate to deliberate indifference. *Petties*, 836 F.3d at 728. Rather, "[w]hen a plaintiff's claim focuses on a medical professional's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Johnson*, 5 F.4th at 825 (internal quotation marks omitted). On that note, the plaintiff's preference for a different—often, more aggressive—course of treatment does not necessarily mean that the treatment he did receive was constitutionally inadequate. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Along those lines, Wexford Defendants argue that Vargas has not established deliberate indifference but instead simply disputes his treatment plan. At the outset, it should be noted that Wexford Defendants reasonably contest Vargas's repeated attempts to premise his claims on pre-Stateville treatment. Vargas was transferred to Stateville in August 2017; there is no allegation that Dr. Elazegui, Dr. Okezie, or Dr. Henze saw him before he arrived at Stateville. Holding these individuals responsible for injuries caused by another treater's conduct would plainly run afoul of § 1983's requirement that "conduct causing the constitutional deprivation" must occur at the defendant's own "direction or with his knowledge and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). The Court's analysis below as to the individual Wexford Defendants therefore considers the record on an appropriately individualized basis.

### 1. Dr. Elazegui

Vargas first saw Dr. Elazegui on January 29, 2018. Dr. Elazegui referred Vargas for an MRI at that meeting, followed Stateville's procedures for obtaining an outside referral, and obtained approval for an MRI. None of the facts regarding Dr. Elazegui plausibly suggest that he

15

pursued an inadequate course of treatment; to the contrary, Dr. Elazegui ordered an MRI at their first meeting and informed Vargas he had been approved just over a month later. He also confirmed that Vargas had low bunk and low gallery permits.

Vargas primarily takes issue with Dr. Elazegui's purported role in delaying his MRI. But Dr. Elazegui promptly ordered the MRI after their first appointment. To the extent Vargas suggests that Dr. Elazegui should have expedited his treatment by circumventing the collegial review process, there is no evidence that Dr. Elazegui actually had that level of authority. *Cf. Gaston v. Ghosh*, No. 11-CV-6612, 2017 WL 5891042, at *11 (N.D. Ill. Nov. 28, 2017) ("[Th]ere is no evidence at all that [the defendant] delayed surgical authorization. In fact, it appears that [the defendant] recommended the surgery to the Wexford collegial review."). There is also a dearth of evidence suggesting that Dr. Elazegui had any reason to think, based on his knowledge of Vargas's condition, that his adherence to a set procedure amounted to a constitutional violation. *See Jones v. Wexford Health Sources, Inc.*, No. 17-CV-8218, 2021 WL 323792, at *7 (N.D. Ill. Feb. 1, 2021) (considering whether there was evidence that "the defendant was actually aware of the severity of the plaintiff's issue"). So far as Vargas takes issue with Dr. Elazegui's other treatment decisions, he similarly fails to present any evidence indicating that Dr. Elazegui "'knew better' than to pursue the course of treatment that he did." *Whiting*, 839 F.3d at 663.

Simply put, Vargas does not point to any evidence in the record that calls into question Dr. Elazegui's treatment decisions—other than Vargas's own disagreement, which does not alone constitute deliberate indifference, *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). As a result, a reasonable juror could not find that Dr. Elazegui was deliberately indifferent. Dr.

Elazegui's motion for summary judgment is therefore granted, and Vargas's motion is denied as to him.

### 2. Dr. Okezie

As with Dr. Elazegui, Vargas testified that he saw Dr. Okezie a handful of times, but he does not offer much detail on the appointments. For their part, Wexford Defendants contend that Dr. Okezie had just two appointments with Vargas: one, shortly before his July 2018 MRI, and the other, shortly following the MRI. Even under Wexford Defendants' version of events, however, Vargas has submitted sufficient evidence to create a question of fact regarding deliberate indifference such that neither motion can be granted.

In connection with the pre-MRI appointment, Vargas focuses on the notion that Dr. Okezie acted with deliberate indifference by not ordering the MRI earlier. But as with his argument regarding Dr. Elazegui, Vargas has not explained how Dr. Okezie could have expedited the process, particularly because an MRI had already been scheduled for less than a month later. It is unclear how Dr. Okezie could have shortened the process or why his declination to do so would constitute deliberate indifference. *Cf. Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (concluding that, although a doctor's decision to "revise[]" a medication order "to match the prison's regular medication distribution schedule" may "have been negligent," there was "nothing in the record to suggest that he knew the change would cause [the plaintiff] serious harm"). Along those lines, Dr. Okezie's prescription of painkillers pending the outcome of the MRI does not constitute deliberate indifference.

Dr. Okezie's conduct following the July 2018 MRI is a separate matter, however. As discussed above, the MRI results indicated that Vargas's ACL was "discontinuous" and "appear[ed] ruptured." (MRI Notes at 1.) Dr. Okezie clearly knew about these results; his notes from the post-MRI appointment reference the MRI and its findings, and they indicate he planned

to refer Vargas to a UIC specialist. (Vargas Med. Rec. at 14.) Wexford Defendants themselves use the word "plan" when describing Dr. Okezie's intentions at this appointment. (PRWSF ¶ 25.) But the evidence is unclear as to whether Dr. Okezie's "plan" was actually enacted. In fact, Vargas did not visit a UIC specialist until May 2019—approximately ten months after the MRI results and nine months after his appointment with Dr. Okezie—and that appears to have been arranged in connection with Dr. Henze's referral from December 2018. Even more, it would be another five months or so until Vargas underwent surgery.

Whether Dr. Okezie's failure to ensure that Vargas saw the UIC specialist in a timely fashion constitutes deliberate indifference is a quintessential question of fact that cannot be resolved in either party's favor at summary judgment. "[A] physician's delay, even if brief, in referring an inmate to a specialist in the face of a known need for specialist treatment may . . . reflect deliberate indifference. Even a delay of less than a week may be the result of deliberate indifference." *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) (citations omitted).

Here, Dr. Okezie knew Vargas needed to see a specialist, as evidenced by his own notes to that effect. Yet it seems Dr. Okezie's plan was not carried out for unknown reasons, resulting in a delay of nearly one year. *Cf. Howell v. Butler*, No. 16-CV-160-RJD, 2019 WL 1864853, at *8 (S.D. Ill. Apr. 25, 2019) (finding insufficient evidence of deliberate indifference when the plaintiff received an "MRI indicat[ing] an ACL tear and meniscus tears" on "July 1, 2014," the treater referred the plaintiff "to collegial for an orthopedic consult on July 31, 2014," and the appointment with the orthopedist occurred "[o]n August 11, 2014"). To be sure, a jury could conclude that Dr. Okezie provided constitutionally adequate care; however, drawing all reasonable inferences in Vargas's favor at this stage, a reasonable jury could alternatively

conclude that the delay in treatment was due to Dr. Okezie's deliberate indifference. *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015).

Wexford Defendants also contend that, even if there was deliberate indifference, Vargas has not shown that Dr. Okezie's conduct caused an injury. In cases involving delayed treatment, "courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). Non-expert testimony can suffice so long as "it permits the fact-finder to determine whether the delay caused additional harm." *Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011). "It is the rare case that does not meet this threshold at summary judgment." *Jackson v. Sheriff of Winnebago Cnty., Illinois*, 74 F.4th 496, 501 (7th Cir. 2023) (internal quotation marks omitted); *see also Conley*, 796 F.3d at 749 ("[C]ausation is normally a matter for the jury." (internal quotation marks omitted)).

Here, the evidence would allow a jury to conclude that the delay in treatment caused a prolongment in Vargas's pain. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) ("A jury could infer that [the defendant's] delay caused [the plaintiff] that many more hours of needless suffering for no reason. That is enough to survive summary judgment."). As Vargas argues, "[f]ailure to provide necessary relief and delaying access to a qualified specialist can lead to prolongation of pain." *Thomas*, 991 F.3d at 771. Vargas did not see any specialist for nearly a year; during the intervening period, he claims to have suffered significant pain. That is enough evidence of causation to stave off Wexford Defendants' motion for summary judgment.

In sum, there remain material questions of fact as to whether Dr. Okezie acted with deliberate indifference following the MRI and whether that deliberate indifference harmed Vargas. Each side's motion for summary judgment is denied as to Dr. Okezie accordingly.

3.      *Dr. Henze*

Dr. Henze is the final individual Wexford Defendant. While there is a factual dispute as to whether the first time Dr. Henze saw Vargas was December 20, 2018, there is no dispute that they met on that date, at which time Dr. Henze renewed Vargas's Tramadol prescription, prescribed Robaxin, ordered x-rays, and referred Vargas for his orthopedic evaluation at UIC. After that evaluation, in May 2019, Dr. Henze met with Vargas again, referring him to physical therapy pursuant for the orthopedic specialist's recommendations. The evidence regarding her treatment indicates there is a question of fact that precludes entry of summary judgment in either party's favor.

Indeed, much of the analysis regarding Dr. Okezie applies equally to Dr. Henze. Like Dr. Okezie, Dr. Henze's notes from the December 2018 appointment reveal that she knew about the MRI results. (Vargas Med. Rec. at 2.) And Dr. Henze also made plans to refer Vargas to a specialist—though she, unlike Dr. Okezie, actually followed through. Still, five more months passed before the May 2019 referral appointment, and this was on top of the five months between Vargas's MRI and his appointment with Dr. Henze. Such a delay could reasonably support a finding of deliberate indifference. *See Thomas*, 991 F.3d at 770 (observing that, with respect to a delayed referral to a specialist, there was "evidence supporting two possibilities: either that [the treater] was deliberately indifferent to [the plaintiff's] needs and caused this delay, or that administrative issues beyond [the treater's] control were to blame"). Moreover, Vargas continued complaining about his pain during the early months of 2019, following his appointment with Dr. Henze. There is evidence that he visited medical personnel multiple times during this period and that he filed a grievance regarding his ongoing pain and the delay in seeing a specialist. (PRWSF, Ex. 3 at 2–7, Dkt. No. 106-3; PRISF, Ex. 4 ("March 18, 2019, Grievance"), Dkt. No. 104-4.) For summary judgment purposes, a reasonable jury could infer

20

that these complaints alerted Dr. Henze to the fact that more aggressive care was required. *Cf.*
*Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020) (concluding there was evidence of a
treater's deliberate indifference when the plaintiff's complaint of continued pain, via grievance,
"prompted . . . no renewed effort to arrange for . . . outside consultation").

Again, the Court's conclusion that there is a question of fact "does not necessarily
indicate" that Vargas will be able to prove deliberate indifference at trial. *Conley*, 796 F.3d at
748. Instead, it simply means that, drawing all reasonable inferences in Vargas's favor, the
record indicates a reasonable jury ***could*** find that Dr. Henze was deliberately indifferent. *Id.* In
addition, a jury could infer that her deliberate indifference caused Vargas's prolonged pain for
the reasons discussed previously. *Jackson*, 74 F.4th at 501.

Once more, then, there are genuine question of fact regarding Dr. Henze's deliberate
indifference and its role in causing Vargas's claimed injuries. Summary judgment is not
appropriate for either party as it concerns Dr. Henze.

### B.     Wexford

The Court now turns to Vargas's Eighth Amendment claim against Wexford. The
Supreme Court's analysis in *Monell v. Department of Social Services*, 436 U.S. 658 (1978),
governs whether Wexford itself, as opposed to its employees, is liable. *Thomas*, 991 F.3d at 773;
*see also Dorsey v. Varga*, 55 F.4th 1094, 1102 (7th Cir. 2022) ("To succeed on a § 1983 claim
against a private corporation acting under color of state law, a plaintiff must show a corporate
custom or practice so widespread that it would be sufficient to state a *Monell* claim if the
defendant were a municipal government."). At least three types of municipal action can give rise
to *Monell* liability: "(1) an express policy that causes a constitutional deprivation when enforced;
(2) a widespread practice that is so permanent and well-settled that it constitutes a custom or
practice; or (3) an allegation that the constitutional injury was caused by a person with final

policymaking authority." *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). The plaintiff must also establish Wexford's fault—either through a direct municipal action that "facially violates a federal right" or, in cases involving indirect municipal action, through evidence that Wexford acted with deliberate indifference "to the plaintiff's constitutional rights." *Id.* at 986–87. Further, Wexford's conduct must have been "the moving force behind the federal-rights violation." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (internal quotation marks omitted).

Vargas cursorily cites two Wexford policies that he claims were responsible for his injuries: (1) Wexford's alleged policy of providing inadequate proper medical treatment, and (2) Wexford's allegedly faulty medical guidelines. The Court considers each in turn.

### 1. Inadequate Medical Treatment

First, Vargas contends that the supposedly inadequate treatment Wexford's employees undertook reflects Wexford's overarching policy to provide inadequate treatment. Although the existence of such a policy is typically shown through similar incidents involving other individuals, it is possible to rely on one's own experiences to establish municipal liability. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). Vargas takes the latter route here, which is "necessarily more difficult." *Id.* (internal quotation marks omitted). Under either method of proof, "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Id.* (internal quotation marks omitted).

Vargas's evidence of a municipal policy falls short. He primarily points to his arguments regarding the individual Wexford Defendants, though he also appears to cite his treatment prior to Stateville. Granted, there is no set number of how many incidents are required to support *Monell* liability. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). But Vargas's vague definition of the policy about which he complains makes it difficult to see how

these myriad incidents, each with their own particular deficiencies, are sufficiently similar to one another such that they reflect a municipal custom. *Cf. Jones v. Vill. of Lynwood*, No. 23 C 4513, 2023 WL 8451815, at *4 (N.D. Ill. Dec. 6, 2023) ("[T]he Court struggles to see how these instances are sufficiently similar in conduct or number to rise to the level of municipal action rather than random, isolated events by individual officers over the course of seven years."). Put another way, Vargas offers no evidence to support the notion that these ostensibly unrelated treatment decisions are traceable to Wexford itself. *E.g.*, *Ballard v. Harmston*, No. 16 C 8166, 2024 WL 942424, at *5–8 (N.D. Ill. Mar. 5, 2024). Rather, Vargas effectively attempts to hold Wexford liable for the actions of its individual employees per a theory of *respondeat superior*, which is not actionable under *Monell*. *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 986.

Vargas therefore has not presented evidence that creates a genuine issue of fact regarding his theory that Wexford has a policy of providing inadequate treatment. His motion for summary judgment is denied as to this theory; Wexford's corresponding motion is granted.

### 2. Guidelines and Collegial Review

Vargas's second theory of municipal liability focuses on Wexford's guidelines, which he reads to require collegial review for non-emergent injuries and to require outside referral to off-site facilities after a patient has experienced chronic pain for six months.

The Court starts with the collegial review process. As described previously, Wexford requires its treaters to refer requests for offsite care through the collegial review system. "[C]ollegial review is not unconstitutional on its face," but it can cause unconstitutional delays as applied to particular plaintiffs. *Dean*, 18 F. 4th at 236. To prevail on such a theory, a plaintiff "generally" needs to show "a prior pattern of similar constitutional violations resulting from the policy." *Id.* "Regardless of the exact form of proof, the question is always whether the municipal

policy reflects a conscious disregard for a known or obvious risk of the constitutional deprivation." *Id.* at 237.

Here, Vargas has not offered sufficient evidence from which to conclude that Wexford acted with deliberate indifference. Although Vargas again appears to rely exclusively on his own experience, he does not name a particular example of a deprivation caused by the collegial review process in support his *Monell* theory. Regardless, cases involving facially constitutional policies require "***considerably*** more proof than [a] single incident . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020) (emphasis added) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985)). Vargas plainly lacks the evidence to establish a pattern of violations, nor does he provide alternative evidence indicating Wexford's deliberate indifference. *See Dean*, 18 F.4th at 236 (discussing the "limited exceptions" to the general rule that "a pattern of violations" is necessary to establish deliberate indifference in connection with a facially valid policy). Simply put, there is no evidence in this case that *Monell* liability can rest on the Wexford's collegial review system.

In addition, there is no evidence that the guidelines prohibited treaters from referring patients with chronic pain to off-site facilities before the six-month mark. Vargas points to a table whose columns are not labeled; presumably, one lists treatment options and the other lists outside referral options. (Pl.'s SF, Ex. 15 at 3, Dkt. No. 77-15.) Assuming that to be the case, it is true that the guidelines state that when there is chronic knee pain, doctors are to "[r]efer after 6 months." (*Id.*) The guidelines, however, clearly allow doctors to make treatment decisions based on their own medical judgment: The guidelines state that they are a "reference tool," that they

"do not replace sound clinical judgment," and that they are not "intended to strictly apply to all patients." (WRPSF, Ex. H at 4, Dkt. No. 123.) In other words, the guidelines do not strip treaters of their medical discretion in the manner Vargas suggests. *Cf. Heard v. Ill. Dep't of Corr.*, No. 06 C 644, 2012 WL 832566, at *8 (N.D. Ill. Mar. 12, 2016) (reasoning that guidelines may be unconstitutional if they categorically prevent treaters from referring a patient to surgery no matter how much pain the condition causes). As such, there is no evidence to suggest that the delay in referring Vargas to outside treatment is attributable to Wexford's guidelines.[7]

In short, there is no genuine question as to whether any Wexford policy identified by Vargas is actionable under *Monell*. Accordingly, Vargas's motion for summary judgment as to Wexford is denied and Wexford's is granted.

### C. IDOC Defendants

Finally, the Court addresses the merits of Vargas's Eighth Amendment claims against the two IDOC Defendants, Miles and Nicholson. As explained above, an individual officer is only liable under the Eighth Amendment if he acts with deliberate indifference, meaning he "knows of and disregards an excessive risk to inmate health or safety" or "is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and proceeds to "draw[] the inference." *Johnson*, 5 F.4th at 825. Miles and Nicholson, as wardens at Stateville, are "prison official[s]," so they "generally do[] not act with deliberate indifference if [they] reasonably relied on the judgment of medical personnel." *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (internal quotation marks omitted). "On the other hand, if jail officials had reason

---

[7] To the extent Vargas attempts to ground his *Monell* claim on Wexford's failure to adhere to its own guideline by waiting longer than six months before referring him to an off-site facility, he offers insufficient evidence to infer that Wexford's "true policy is to violate its written one." *Horton v. City of Chicago*, No. 10 C 3968, 2012 WL 379770, at *3 (N.D. Ill. Feb. 3, 2012).

to know that their medical staff were failing to treat or inadequately treating an inmate, liability

is possible." *Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018).

The parties focus much of their energy on disputing the extent to which Miles and

Nicholson were aware of Vargas's condition and his complaints about his treatment. The record

indicates that this dispute cannot be resolved at summary judgment; there is evidence that IDOC

Defendants each signed grievances Vargas had filed, but IDOC Defendants claim that the

designees' initials on the signature lines mean they did not see the document personally. *See e.g.*,

*Brown v. Carter*, No. 13 C 2775, 2017 WL 2362597, at *3 (N.D. Ill. May 31, 2017) (concluding

there was a dispute of material fact as to the defendant's knowledge in light of evidence that his

signature appeared on "several grievances" even though he argued that a designee was

responsible). As for Vargas's claim that he had a conversation with Nicholson about his knee, it

is true that his account lacks details, such as the date they purportedly spoke. But "[o]n summary

judgment a court may not make credibility determinations, weigh the evidence, or decide which

inferences to draw from the facts; these are jobs for a factfinder." *Runkel v. City of Springfield*,

51 F.4th 736, 741 (7th Cir. 2022) (internal quotation marks omitted). In short, there is a question

of fact as to whether IDOC Defendants were aware of Vargas's complaints.

That is not the end of the inquiry. Mere knowledge of an inmate's complaints does not

necessarily equate to deliberate indifference. *See Dobbey v. Carter*, No. 12 CV 9223, 2015 WL

5693109, at *7 (N.D. Ill. Sept. 28, 2015) ("[T]he denial of a grievance, by itself, is often

insufficient to establish the personal involvement that is required to establish a § 1983 claim.").

Rather, the plaintiff must show that the officials became aware of the need to intervene in his

treatment but did not follow through—in other words, that they had a "duty to do more than they

did, in light of their knowledge of the situation." *Eagan*, 987 F.3d at 696 (internal quotation

marks omitted). A nonmedical official cannot simply "ignore the prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotation marks omitted).

For reasons similar to those discussed previously, there is a genuine question of fact regarding whether IDOC Defendants were deliberately indifferent to Vargas's medical needs. On the one hand, if a jury were to conclude that Vargas received constitutionally adequate medical treatment, IDOC Defendants would have no obligation to intervene in the first place. *See, e.g.*, *Alvarez v. Wexford Health Sources, Inc.*, No. 13 C 703, 2016 WL 7046617, at *8 (N.D. Ill. Dec. 5, 2016) (granting summary judgment to the nonmedical defendants because the plaintiff had been receiving treatment "in a constitutionally adequate manner" at the time he complained of his medical care); *cf. Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (explaining that, "for there to be a failure to intervene, . . . there must exist an underlying constitutional violation" in the context of a false arrest claim). But again, a jury might instead conclude that the nearly year-long delay between Vargas's MRI and his first appointment with a specialist was too long as a constitutional matter.

If the jury were to reach the latter conclusion, it could also find that IDOC Defendants were deliberately indifferent to the delays. Indeed, Nicholson and Miles each signed at least one grievance Vargas filed after the MRI but before the referral appointment in which Vargas explicitly mentioned the MRI results and complained about his ongoing pain as well as the inadequate treatment he was receiving. (March 18, 2019, Grievance; PRISF, Ex. 15 ("October 10, 2018, Grievance"), Dkt. No. 104-15.) Regardless of any exhaustion issues, these grievances would have informed Nicholson and Miles of the risk that "their medical staff were failing to treat or inadequately treating an inmate." *Eagan*, 987 F.3d at 694 (internal quotation marks omitted). What is more, IDOC Defendants do not point to evidence indicating that, in response to

these complaints, they took steps to intervene or even confirmed that Vargas's treatment was progressing at an appropriate rate. *See Snow v. Obaisi*, No. 1:17 CV 4015, 2021 WL 4439421, at *8 (N.D. Ill. Sept. 28, 2021) ("There is no evidence that [the defendants], in fact, deferred to the judgment of medical professionals; rather, they (or their staff) either ignored [the plaintiff's] grievances outright or denied them as emergencies.").

For these reasons, disputed issues of fact preclude summary judgment for either side. Vargas's motion and IDOC Defendants' motion are thus denied.

## CONCLUSION

For the reasons stated above, Vargas's motion for summary judgment (Dkt. No. 75) and IDOC Defendants' motion for summary judgment (Dkt. No. 83) are denied. Wexford Defendants' motion for summary judgment (Dkt. No. 86) is granted as to Dr. Elazegui and Wexford but denied as to Dr. Okezie and Dr. Henze. Finally, "[b]ecause the standard required to demonstrate an Eighth Amendment violation meets the punitive damages standard," the Court denies Wexford Defendants' request to bar punitive damages as to Dr. Okezie and Dr. Henze. *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988).

ENTERED:

Dated: March 31, 2024

_____

Andrea R. Wood
United States District Judge

28